**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MELISSA MCCABE AND JARED CHARLAP, <br><br> Plaintiffs, <br><br> v. <br><br> AUSTIN'S SHOES, LLC, <br><br> Defendant. | Civil Action No.   2:23-cv-1019 <br><br> COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF**

MELISSA MCCABE and JARED CHARLAP ("Plaintiffs"), by and through undersigned counsel, seek a permanent injunction requiring a change in AUSTIN'S SHOES, LLC's ("Austin's Shoes", and "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

**INTRODUCTION**

1.      This action arises from Defendant's failure to make its digital properties accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189.

2.      It is estimated that 2.3 percent of the American population lives with some sort of visual disability. *See* Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), *available at* www.disabilitystatistics.org (last accessed June 8, 2023).

1

3.      For this significant portion of Americans, accessing digital platforms, mobile applications, and other information via their smartphones has become critical, especially during the current COVID-19 pandemic. Indeed, this discrimination is particularly acute during the pandemic. According to the Centers for Disease Control and Prevention ("CDC"), Americans living with disabilities are at higher risk for severe illness from COVID-19 and, therefore, are recommended to shelter in place throughout the duration of the pandemic.[1] This underscores the importance of access to online retailers, such as Defendant, for this especially vulnerable population.

4.      During these challenging times, disabled individuals risk losing their jobs, experiencing difficulty acquiring goods and services like health care, and being deprived of the information they need to stay safe. *See* Slate, *The Inaccessible Internet 2020, available at* https://slate.com/technology/2020/05/disabled-digital-accessibility-pandemic.html (last accessed June 8, 2023).

5.      At the same time, the share of Americans who own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *See* U.S. Census Bureau, U.S and World Population Clock, *available at* https://www.census.gov/popclock/ (last accessed June 8, 2023) (U.S. population on June 12, 2019 was 328.1 million).

6.      In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities. National Council on Disability,

---

[1] *See* Centers for Disease Control and Prevention Digital Platform, *Coronavirus Disease 2019 (2019), available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed June 8, 2023) ("Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.").

*National Disability Policy: A Progress Report* (Oct. 7, 2016), *available at* https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed June 8, 2023).

7.      When it is properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service. *See* Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), *available at* https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last accessed June 8, 2023).

8.      Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use digital platforms. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring his to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a digital platform by listening and responding with his keyboard.

*Id*. at *6-7.[2]

---

[2]      *See* American Foundation for the Blind, *Screen Readers*, *available at*

9.     Unfortunately, here Defendant fails to communicate effectively with Plaintiffs because its digital properties are not properly formatted to allow legally blind users such as Plaintiffs to access its digital content. Accordingly, legally blind customers such as Plaintiffs are deprived from accessing information about Defendant's products and using its online services, all of which are readily available to sighted customers.

10.     The United States Department of Justice Civil Rights Division has recently provided "Guidance on Web Accessibility and the ADA."[3] It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

11.     This lawsuit is aimed at providing legally blind users like Plaintiffs a full and equal experience.

## PARTIES

12.     Plaintiff McCabe is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq. Plaintiff McCabe suffers from Nystagmus, a congenital, progressive eye disease.  She uses Voice-Over and ZoomText to navigate the internet. Plaintiff McCabe is, and at all times relevant hereto has been, a resident of Racine, Wisconsin.

13.     Plaintiff Charlap is, and at all times relevant hereto has been, a resident of Allegheny County, Pennsylvania. Plaintiff Charlap is legally blind. He was born with Ocular

---

https://www.afb.org/node/16207/screen-readers (last accessed June 8, 2023) (discussing screen readers and how they work).
[3] See ADA.Gov, *Guidance on Web Accessibility and the ADA*, *available at* https://ada.gov/web-guidance/ (last accessed June 8, 2023) ("DOJ Guidance").

Albinism, a condition that affects the development of the eyes. In Plaintiff Charlap's case, the condition resulted in underdeveloped retinas causing blindness. He uses ZoomText to navigate the internet. Plaintiff Charlap is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq.

14.    Defendant is a Mississippi limited liability company with its principal place of business located at 1792 Highway 72 East, Corinth, Mississippi 38834. Defendant is a leader in the sale and distribution of shoes and footwear under its recognized brand name Austin's Shoes.

15.    Consumers may purchase Defendant's products and access other brand-related content and services at https://www.austinsshoes.com/ ("Digital Platform"), the Digital Platform Defendant owns, operates, and controls.

16.    In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Digital Platform to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.[4]

17.    Defendant is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

18.    Because Defendant's Digital Platform is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its digital properties to become and

---

[4]    *See, e.g.*, Defendant's Home Page, *available at* https://www.austinsshoes.com/.

remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek prospective injunctive relief

requiring Defendant to:

a)  Retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities;

b)  Work with the Web Accessibility Consultant to ensure all employees involved in Digital Platform and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c)  Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d)  Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Digital Platforms, in addition to the testing, if applicable, that is performed using semi-automated tools;

e)  Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)  Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g)  Directly link from the footer on each page of its Digital Platform, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Digital Platform to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Digital Platform;

h)  Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)  Provide a notice, prominently and directly linked from the footer on each page of its Digital Platform, soliciting feedback from visitors to the Digital Platform on how the accessibility of the Digital Platform can be improved. The link shall provide a

method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform;

k)  Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology;

m)  Plaintiffs, their counsel, and their experts monitor the Digital Platform for up to two years after the Mutually Agreed Upon Consultant validates the Digital Platform is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Digital Platform Accessibility Consultant provides Defendant.

19.  Digital platforms have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible digital platform will not cause the digital platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible digital platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the digital platform to remain accessible, the digital platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

20.    The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

21.    Defendant participates in the Commonwealth's economic life by performing business over the Internet. Through its Digital Platform, Defendant entered into contracts for the sale of its products and services with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Suchenko v. ECCO USA, Inc.*, No. 18cv0562, 2018 U.S. Dist. LEXIS 129862 (W.D. Pa. Aug. 2, 2018); *Gniewkowski v. Lettuce Entertain You Enters.*, 251 F. Supp. 3d 908 (W.D. Pa. 2017); *Gathers v. N.Y. & Co.*, No. 16cv1375, 2017 U.S. Dist. LEXIS 11653 (W.D. Pa. Jan. 27, 2017).

22.    Plaintiffs were injured when they attempted to access Defendant's Digital Platform from their homes in Racine, Wisconsin and this District, respectively, in an effort to shop for Defendant's products, but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services. Plaintiffs are both avid runners. Plaintiff McCabe attempted to purchase the "Women's Cloud X 3" running shoes, while Plaintiff Charlap attempted to purchase the "Men's Cloudrift" running shoes. Unfortunately, they were unable to complete their purchases due to the inaccessibility of Defendant's Digital Platform.

23.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claim occurred.

///

## FACTS APPLICABLE TO ALL CLAIMS

24.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, digital platform developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

25.    Defendant's Digital Platform allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

26.    The Digital Platform also enables consumers to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, and more.

27.    Consumers may use the Digital Platform to connect with Defendant on social media, using sites like Facebook and Instagram.

## HARM TO PLAINTIFFS

28.    Plaintiffs attempted to access the Digital Platform from their homes in Racine County, Wisconsin and Allegheny County, Pennsylvania to purchase running shoes. Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access programs, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Digital Platform. The following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Digital Platform:

a.    There are several mislabeled product buttons present on the "On Running" collections page. For example, there are three buttons displayed under the "Cloudswift 3" product

tile. When screen-reader focus arrives on the "Cloudswift 3" product buttons, they are mistakenly announced with the wrong product name. Each button is announced as "Cloudswift 11 link." Similarly, the buttons displayed under the "Women's Cloudswift 3" product are announced as "cloudswift 12 link." This impedes the screen-reader user's ability to find and select the correct product that they wish to purchase.



b.     There are four color options available for the "Men's Bamboo Solid" product. However, the color buttons are not accessible to screen-reader users. For example, when screen-reader focus arrives on the color buttons, each one is announced as "solid link" and none of the colors are announced. The result is that the screen-reader user will be unable to determine the function of these buttons and unaware of the color options available for the product.



      c.      If an error occurs when a user attempts to create an account, an error message will be displayed in red to let the user know how to fix the issue. Unfortunately, the error messages are not accessible to screen-reader users. For example, when the error messages are displayed, they do not receive screen-reader focus and are not announced to the screen-reader user. Instead, screen-reader focus moves to the "First Name" field. This creates confusion because the screen-reader user is unaware that their previous attempt was unsuccessful.

///

///



29.     These barriers, and others, deny Plaintiffs full and equal access to all of the services

the Digital Platform offers, and now deter them from attempting to use the Digital Platform to buy

Defendant's goods and services. Still, Plaintiffs intend to attempt to access the Digital Platform in

the future to purchase the products and services the Digital Platform offers, or to test the Digital

Platform for compliance with the ADA.

30.     If the Digital Platform was accessible, *i.e.* if Defendant removed the access barriers

described above, Plaintiffs could independently research and purchase Defendant's products and

access its other online content and services.

31.     The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by

removing these existing access barriers. Removal of the barriers identified above is readily

achievable and may be carried out without much difficulty or expense.

32.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen-reader technology.

## SUBSTANTIVE VIOLATIONS

### FIRST CAUSE OF ACTION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

33.     The assertions contained in the previous paragraphs are incorporated by reference.

34.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

35.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities. 28 C.F.R. § 303(c). *See also* DOJ Guidance (stating "[s]ince 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.")

36.     Plaintiffs are legally blind and therefore individuals with disabilities under the ADA.

37.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment." 42 U.S.C. § 12181(7)(E), (F).

38.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §36.201.

39.     Defendant owns, operates, or maintains the Digital Platform.

40.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

41.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. *See also* DOJ Guidance (explaining "[b]usinesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.")

42.    Specifically, "[e]ven though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities." DOJ Guidance.

## PRAYER FOR DECLARATORY JUDGMENT AND PROSPECTIVE INJUNCTIVE RELIEF

WHEREFORE, Plaintiffs pray for:

(A)    A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure

that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law, including the specific prospective injunctive relief described more fully in paragraph 18 above.

(C)    Payment of costs of suit;

(D)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(E)    Payment of nominal damages;

(F)    The provision of whatever other relief the Court deems just, equitable and appropriate; and

(G)    An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders in regard to the specific prospective injunctive relief described at paragraph 18 above.

Dated: June 8, 2023                          Respectfully Submitted,

                                             */s/ Benjamin J. Sweet*
                                             Benjamin J. Sweet
                                             ben@nshmlaw.com
                                             **NYE, STIRLING, HALE, MILLER & SWEET, LLP**
                                             1145 Bower Hill Road, Suite 104
                                             Pittsburgh, Pennsylvania 15243
                                             Phone: (412) 857-5350

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE, STIRLING, HALE, MILLER &
SWEET,  LLP**
33 W. Mission Street, Suite 201
Santa Barbara, California 93101
Phone: (805) 963-2345

*Attorneys for Plaintiffs*